1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE MIDDLE DISTRICT OF FLORIDA**

8

**ORLANDO DIVISION**

9

Joshua Crockett,

6:24-cv-01271-CEM-DCI

10

Plaintiff,

**PLAINTIFF'S
AMENDED COMPLAINT**

11

v.

12
13

Orange County Board of
County Commissioners,

14

Defendant.

15
16
17

The undersigned, ("Joshua Crockett") comes before this Court pursuant to the Judge's Endorsed Order per [Doc. 39]. As such, the undersigned states the following:

18

**A. Introduction**

19

**1. Factual Background**

20
21
22
23
24
25
26
27
28

1. This discrimination employment complaint arises out of the actions executed by Assistant Security Supervisor Charles Young (black) that resulted in the undersigned being subjected to direct discrimination on the job in the role of Security Representative at the Orange County Convention Center. To illustrate this point, the first such documented instance occurred on July 21, 2019 when the undersigned was stripped of his role of managing the AED and Fire Extinguisher programs respectively, including training of the new hires per the training program. Instead, Charles Young (black) justified the adverse employment action by refusing

1  to pay the seven percent out of class pay as stipulated by the Liuna 517 contract

2  and in accordance with the Security Division's SOP at the time.

3      2.  Inevitably, this action by Charles Young (black) constituted a covert adverse

4  employment action against the undersigned as it was put in writing - an email to be

5  quite specific which was directed at the Plaintiff. Subsequently, this marked the

6  beginning of the end, as the adverse harm experienced at this juncture was

7  immediate and remained in full force and effect against the undersigned's once

8  impeccable reputation. In fact, this incident would become symbolic, as it was the

9  last time the undersigned would receive a highly rated annual performance

10 evaluation; thus, the undersigned's efforts to get promoted within Orange County

11 Government never materialized during the golden years of the undersigned's

12 employment history, despite substantial efforts to do so. With this in mind, the

13 undersigned began his employment with Orange County on January 5, 2016 as an

14 on-call console operator within the Security Division and he was subsequently

15 promoted to full-time Security Representative on September 26, 2016 by the

16 former Orange County Security Manager of the Security Division, Tim Wood

17 (white). As such, the undersigned finished his probation on March 26, 2017 and

18 passed with flying colors, despite being a white male ("sex") with long hair below

19 his collar and on his shoulders in celebration of his race ("European") and national

20 origin ("Chippewa Indian") given his unique type of hair.

21     3.  Even so, according to the undersigned's annual performance evaluations

22 which Orange County doesn't dispute, among other things, the evidence is

23 conclusive - the undersigned maintained a professional appearance on the job

24 based on the check box for the 2016-2017 annual performance evaluation; the

25 2017-2018 annual performance evaluation; the 2018-2019 annual performance

evaluation; the 2019-2020 annual performance evaluation and the 2020-2021 annual performance evaluation. However, that all suddenly changed in the 2021-2022 annual performance evaluation when Charles Young (black) wrote, "Joshua's does not maintain a professional appearance" under Section B of the annual performance evaluation titled, "Position Specific Elements" which is recommended for all employees not required. So, the pivotal question is, what suddenly changed to warrant the undersigned being terminated from Orange County Government over a formerly accepted professional appearance on June 19, 2023?

4.   Unfortunately, the straw that broke the camel's back was multi-faceted; first, Charles Young (black) regarded the undersigned as a thorn in his side since July 21, 2019. As a result, the undersigned's formerly accepted professional appearance became an issue on Tuesday, November 30, 2021 at 0617 hours, which occurred 2,156 days into the job, prior to this incident, there were no verbal communications and/or written communications about the undersigned's professional appearance ever being an issue within the Security Division. In that conversation, with the undersigned and Charles Young (black) it became crystal clear that the latest COVID-19 charges that were issued just 6 days earlier on November 24, 2021 had a direct impact that was so blatantly adverse and severe to the point which made COVID-19 the pivotal catalyst that would spiral into an all out assault against the undersigned to find something, anything at all to charge him and ultimately see to his demise within Orange County Government. In fact, in that conversation, Charles Young (black) knowingly and willfully said, "*your hair needs to be pulled back*" and the undersigned responded, "*it's pulled back*" and Charles Young (black) said, "*you know the policy*" before quickly

disappearing out of sight. Ultimately, the writing was on the wall, because at 0759 hours that day, Charles Young (black) returned with a copy of the EG2 Grooming policy which was never enforced because Charles Young (black) including the rest of Security Management had knowledge of J. Crockett being the only male with long hair who openly celebrated his Chippewa Heritage ("national origin") and race ("European") with his various hairstyles on the job given his type of hair.

5. In conclusion, Charles Young (black) sent an email with the subject line: "Uniform Policy" on September 4, 2022 at 1112 hours to the undersigned exclusively which stated, "*Hello Mr. Crockett, under the Security Grooming Standards (EG2) (D-1 a,b,c) the length of your hair must not exceed the top of your collar. Your beard must be kept neatly trimmed and in a conservative style.*" Ultimately, this email occurred exactly 1,019 days including the end date following the severe incident in which Charles Young (black) violently jumped off a security golf cart to spit saliva in the undersigned's face on camera at Ramp 15 in the N/S Concourse in public which was shockingly captured on video. To make matters worse, Charles Young (black) didn't send this email to the female security representatives of color or the female security personnel of color who were subject to the same EG2 Grooming policy as the undersigned, yet in violation for the same, but exempt due to their Black Privilege.

6. Subsequently, on October 25, 2022 at 0713 hours the undersigned received an email from Charles Young (black) with the subject line, "FW: EG2 Uniform Policy" and in the body of the email: "*FYI, ensure you are following this policy.*" Meanwhile, female security representatives of color and security personnel of color, including all other county employees in other departments with long hair below the collar and on the shoulders continued to interact with the public without

being deemed to have an unprofessional appearance due to their type of hair; however, the exception was Joshua Crockett who was exclusively subject to adverse employment actions over an alleged unprofessional appearance due to the wrong type of hair in relation his race, color, national origin and sex. In essence, non-compliance continued within the Security Division, but the only employee adversely affected was J. Crockett as he was the only white male with long hair who openly celebrated being a Chippewa Indian and European with his various hairstyles on the job given his unique type of hair.

7. For example, on October 6, 2022 the undersigned contested his 2021-2022 annual performance evaluation by writing in the "Employee Feedback" section: "*pre-existing issues, I disagree with the assessment*." In fact, Charles Young (black) wrote the following under the "General Comments" section: "*Joshua does not maintain a professional appearance while on duty. Joshua needs to improve his duties at the guard shack*."

8. To be fair, were any of the other female security representatives of color or female security personnel of color adversely affected on their annual performance evaluation over the EG2 Grooming policy? To Joshua Crockett's knowledge as of this writing, the only employee adversely affected within the Security Division over the EG2 Grooming policy was him ("Mr. Crockett"). To make matters worse, non-compliance over the EG2 Grooming policy continues unabated even after J. Crockett's termination on June 19, 2023. In a never before released photograph taken on November 9, 2023 at 1154 hours, a woman of color in the role of Security Representative is depicted in uniform in violation of the EG2 Grooming policy with a different type of hair than Petitioner; thus, Orange County officials knowingly and willfully violated the law.

9.  In light of the foregoing, Security Manager Isiah White Jr. (black) hired his former Orlando Police Department ("OPD") Lieutenant Daniel Brady (white) to fill a newly created "Security Supervisor" position which wasn't needed, but for the sole purpose to strategically target the undersigned over his type of hair in relation to his race, national origin and sex in a covert attempt to cover-up color discrimination. As such, Daniel Brady (white) was hired on March 23, 2022; however, the mask mandate at the Orange County Convention Center was lifted on March 4, 2022 exactly 29 days after the undersigned submitted a Public Records Request ("PRR") requesting for video evidence showing widespread mask non-compliance in the heart of Central Florida at the third largest convention center in the nation.

10.  Unfortunately, the head of Risk Management John Petrelli (black) decided to provide a fraudulent quote for $336,000 before fulfilling PRR-83675; thus, the undersigned was unable to get that evidence despite requesting for it on February 3, 2022.

11.  Nevertheless, the Security Division has always had one sole "Security Supervisor" position which had oversight over three Assistant Security Supervisors; however, these Assistant Security Supervisors managed the day-to-day operations of each shift for a 24/7 operation. Importantly, Security Supervisor Sandra Dailey (black) was the sole official until Daniel Brady (white) joined as an equal on March 23, 2022 for the sole purpose of eliminating Joshua Crockett at all costs to cover-up the pervasive Black Privilege. Again, what other legitimate non-discriminatory reason warranted the creation of this additional Security Supervisor position? Again, Isiah White Jr. (black) is responsible for the creation of a second "Security Supervisor" position.

12.  Unfortunately, J. Crockett remained segregated as the de facto COVID-19 leper in the Hall A Parking Garage in the West Building isolated in a booth away from his peers, despite the lifting of the mask mandate on March 4, 2022. Orange County's "pretext" is J. Crockett allegedly requested training, but no such evidence exists in the record.

13. Initially, the County pressured J. Crockett to comply with the mask mandate or be subjected to adverse employment actions. To be fair, J. Crockett experienced breathing issues with the cloth and surgical masks due to the obstructed flow of oxygen due to his asthma. In addition, the Convention Center would've failed any legitimate investigation for failure to maintain sanitary conditions, as photographs of black mold exists which can be presented if challenged.

14. More importantly, why did Security Manager Isiah White Jr. (black) and Sr. Human Resources Advisor Monica Woods (black) continue to keep J. Crockett segregated in the Hall A Parking Garage, despite the lifting of the mask mandate on March 4, 2022? Ultimately, the alleged pretext by Orange County for J. Crockett's segregation was social distancing. In contrast, the COVID-19 crisis was merely the catalyst which provided an illegal license for Orange County Government ("the public agency") to discriminate against the undersigned under the guise of a public health emergency. In conclusion, the alleged pretext was completely manufactured and would've never happened, but for J. Crockett's unacceptable color, race, national origin, sex, religion and perceived disability. Again, J. Crockett remained segregated as the de facto COVID-19 leper until March 9, 2023. However, the inquiry that should be investigated remains, why did J. Crockett remain segregated for another 370 days

after the lifting of the mask mandate at the Orange County Convention Center on March 4, 2022?

15. Moreover, why did Isiah White (black) in conjunction with Security Administrator Sylvester Earl Biggett (black) and Security Supervisor Sandra Dailey (black) modify the EG2 Grooming policy on October 24, 2022? Secondly, why did Isiah White Jr. (black) state under oath in a state deposition to the Florida Commission on Human Relations via a signed affidavit that the undersigned was authorized to wear his hair in a ponytail 31 days earlier on September 23, 2022; however, the new policy subsequently outlaws the wearing of a ponytail?

16. In fact, Security Supervisor Daniel Brady (white) sent J. Crockett an email on January 17, 2023 at 1350 hours with the subject line, "Return to Rotation and Training", yet put this in writing in the body of the email: "*We also discussed the Uniform and Grooming policy, which is attached (also given to you in person). This Policy was approved on 10/24/22. Please be in compliance with this policy, we are giving you ample time to explore your options, if you disagree with this policy*." Lastly, why was J. Crockett exclusively targeted in the email over his type of hair?

17. In summary, this was a sinister tactic to strategically cripple J. Crockett in all facets of his employment contract with Orange County Government. Nevertheless, J. Crockett responded via email on January 19, 2023 at 1356 hours to oppose the blatant discriminatory chessboard tactic which sent shock waves through Security Management. For example, J. Crockett responded with the subject line, "RE: Return to Rotation and Training" and in the body of the email: "*you're making a decision that puts me at risk given the*

*well-documented nature of this toxic workplace environment that I've described in vivid detail to county officials over the years within the Security Department. Also, why do you and/or your designee(s) continue to engage in blatant harassment, discrimination and retaliation against me over this Uniform and Grooming Policy nonsense that you and/or your designee(s) keep trying to shovel down my throat? Furthermore, what is the motive for this sudden decision? Again, everything that happened in the 'past' is personal for me and rightfully so, as I am stigmatized due to a corrupt network of officials that punish the innocent and prop up the guilty.*

18. Even so, in the same email described above that was sent on January 19, 2023 at 1356 hours, J. Crockett added: "*Unfortunately, until I see 'Security Management' collectively make a meaningful attempt at rectifying it - nothing will change. Whether you realize it or not, I was robbed of my dignity, I was made out to be the mannequin of Security and perceived as a leper among many of my peers. Shockingly, I don't have a short term memory, as it is fresh in my mind because I'm the man who's walked the narrow path, experienced the animus exhibited towards me continually and is living with the stigma of it all. In light of the foregoing, I will provide a snippet to you of what it means to succeed in my shoes, as a Security Representative at the Orange County Convention Center. For the record, I've applied for 47 job opportunities within the County during my tenure and yet I am consistently overlooked without fail - that's what it means to succeed. In conclusion, you come to accept that discriminatory behavior is common practice in the County, as this is just one of the many tentacles of corruption that I am subject to when I try to advance my career within the County. Ultimately, the animus against me is alive and well, so*

1    *why should I be subject to additional retaliation?*

2         19. In addition, J. Crockett added in that same email discussed above: "*Be*

3    *forewarned, if you and/or 'Security Management' collectively decide to push*

4    *forward with this initiative, all parties behind this scheme assume liability if any*

5    *escalation occurs.*" In conclusion, this writing by J. Crockett resulted in a

6    suspension with pay for 42 days. As a result, the undersigned was placed under

7    investigation for potential policy violations, but more so, J. Crockett was

8    subjected to a psychiatric examination for exposing unlawful activities since he

9    engaged in protected activity. Fortunately, Orange County's doctor recognized the

10   entire premise was a sham and J. Crockett successfully passed his psychiatric

11   examination with flying colors. Unfortunately, while all of this was ongoing,

12   rumors were swirling out of control like a wildfire at the Convention Center. To

13   make matters worse, one of the two officials who relieved J. Crockett of duty on

14   January 22, 2023 was spreading the gossip further slandering J. Crockett's

15   reputation; thus, enhancing a hostile work environment. As such, J. Crockett was

16   between the devil and the deep blue sea due to Sr. Security Representative Malone

17   Drakes (black) spreading the gossip on the job.

18        20. In light of the foregoing, the other official who was there on Sunday,

19   January 22, 2023 to relieve J. Crockett of duty that day over alleged policy

20   violations was former Security Supervisor Daniel Brady (white) who conveniently

21   resigned on August 25, 2023 with Orange County prior to testifying in Florida's

22   Division of Administrative Hearings case #22-3897.

23        21. In essence, Daniel Brady (white) saw the writing on the wall and did

24   what any whipping boy would do which is quietly resign to save himself. In fact,

25   he did what he was hired to do which was to unlawfully terminate J. Crockett

1   *under the guise of policy violations pertaining to Joshua Crockett's type of hair*

2   *in relation to his appearance ("the EG2 Grooming Policy"). Nevertheless, it is*

3   *important to consider these facts; 1) women of color were subject to the same*

4   *policy, but were exempt due to Black Privilege and 2) whether they were in the*

5   *same job position of Security Representative as the undersigned or a Security*

6   *Supervisor, Console Operator or Video Surveillance Coordinator - all job*

7   *positions were subject to the same EG2 Grooming policy, because the language*

8   *applied to "all security personnel" which is sweeping legal terminology, even so,*

9   *they were issued uniforms. However, the only reason the undersigned wasn't*

10  *immediately disciplined for his alleged failure to maintain a professional*

11  *appearance after the absurd COVID-19 charges appeared to fail on February 3,*

12  *2022 is because Isiah White Jr. (black) recognized 1) he needed a scapegoat who*

13  *wasn't the same color as him to willingly break the law and violate the*

14  *undersigned's civil rights and 2) Isiah White Jr. (black) needed some time to*

15  *pass so the casual link between the adverse employment actions related to*

16  *COVID-19 would appear unrelated on the surface upon initial examination. As*

17  *such, Isiah White Jr. (black) hired a former subordinate to fill a newly created*

18  *position of Security Supervisor. In so doing, Security Supervisor Sandra Dailey*

19  *(black) was relieved of her supervisory responsibilities over Security*

20  *Representatives and Sr. Security Representatives and this torch was*

21  *strategically handed over to the newly hired Security Supervisor Daniel Brady*

22  *(white) on March 23, 2022. To put this into perspective, 1) Isiah White Jr. (black)*

23  *is a retired Orlando Police Department ("OPD") Captain who worked at the*

24  *Orlando International Airport ("OIA") and Daniel Brady (white) is a retired*

25  *Lieutenant who worked at the Orlando International Airport under the*

- 11 -

authority of Isiah White Jr. (black) who was in his chain of command.

22. Therefore, the quid pro quo is exposed based on [paragraph 21]; thus, this reveals a covert plot was successfully executed to deprive J. Crockett of his civil rights under the color of law.

23. Furthermore, Sr. Security Representative Malone Drakes (black) was hired over J. Crockett (white). As an example, J. Crockett applied for the Sr. Security Representative position ("three openings at the time") and participated in the interview process on March 31, 2022. Unfortunately, out of all the candidates, two were selected; however, J. Crockett was passed over despite 1) being a white male with long hair, who openly celebrates his national origin ("Chippewa Indian") and race ("European") on the job with his hair texture and 2) despite being qualified when he ("Mr. Crockett") applied and 3) he was rejected due to his unacceptable color, race, national origin, sex in relation to his type of hair, including his unacceptable religion ("Follower of Yeshua HaMashiach") and disability ("asthma"). As such, the job posting was reposted again searching for similarly qualified applicants to fill the last vacancy for the position of Sr. Security Representative and Malone Drakes (black) outside of the undersigned's protected classes was selected for the role, who was hired from the outside. Interestingly enough, Malone Drakes (black) previously worked at the Amway Center and had a working relationship with Isiah White Jr. (black) who is the NBA's Security Consultant for the Orlando Magic situated at the Amway Center and the newly hired Security Administrator Sylvester Earl Biggett (black) who was the former Assistant Orlando Venues Security Manager at the Amway Center. Thus, this Failure to Hire claim is relevant in toto for the entire duration of Joshua Crockett's employment.

24. Ironically, a new position was created out of thin air for the boys with the City of Orlando and the Orlando Police Department ("OPD"). As such, Trenton Campbell (black) was hired to be the Video Surveillance Coordinator, formerly a City of Orlando employee with connections to Isiah White Jr. (black) and Sylvester Earl Biggett (black) through Local ASIS Chapter 63 out of Orlando, Florida. Nevertheless, Trenton Campbell (black) didn't stay long in his new position, as he was quickly promoted to Fire Marshall within the Orange County Public School system, as he secured a gig worth over six figures. Additionally, the other position created at that time was the Video Surveillance Operator position which was under the Video Surveillance Coordinator position. In conclusion, Darrell Wring (black) was hired for that role, a former Orlando Police Department officer with connections to Isiah White Jr. (black); thus, ensuring pervasive favoritism and Black Privilege.

25. To put things into perspective, Isiah White Jr. (black) continued the trend of hiring his cronies with whom he had substantial connections with in his previous role with the Orlando Police Department and/or at the Amway Center. As such, when Trenton Campbell (black) was promoted again to Fire Marshall, the Video Surveillance Coordinator position was already slated for Darrell Wring (black) who was temporarily filling the role of Video Surveillance Operator; thus, equal opportunity was merely an illusion within Orange County Government. In conclusion, the undersigned presented shocking evidence that proved without a shadow of a doubt whatsoever that 1) while the Video Surveillance Coordinator position was opened on November 7-14, 2022 the outcome was already decided and 2) on November 11, 2022 upon analyzing county emails, a county email titled, "RE: Happy Veterans Day!" conclusively proved that Darrell Wring (black) was

already promoted while the job posting was still listed publicly. As an example, in that email, under Darrell Wring's name, his new job title was already updated to: "Video Surveillance Coordinator" and the county witnesses were unable to provide any legitimate non-discriminatory rebuttal to counter such direct evidence.

26. In essence, J. Crockett received a "Notice of Pending Disciplinary Action" on January 26, 2023 via his personal email from Administrative Assistant Linda Hall (black). Unfortunately, this was over the email J. Crockett sent on January 19, 2023; thus, Orange County laid the foundation for a retaliation claim since J. Crockett engaged in protected activity and reported discrimination in relation to his color, race, national origin and sex due to his type of hair.

27. Moreover, J. Crockett received an email titled, "Subject: Fitness for Duty" from Sr. Human Resources Advisor Hector Lopez on February 15, 2023 which stated in the body of the email: "*Orange County Convention Center Human Resources recently received information which raised some concerns relative to your ability to safely and appropriately perform the duties of your position*." Unfortunately, this resulted in J. Crockett being subjected to a psychiatric evaluation over the email sent on January, 19, 2023.

28. Of course, the county-authorized physician Dr. Evan Lowe didn't see any issues with J. Crockett's ability to safely and appropriately perform the duties of the position of Security Representative; thus, dismantling Orange County's scheme to get J. Crockett deemed, "crazy" or worse, a "domestic terrorist." Again, the situation was so ridiculous, the day J. Crockett was relieved of duty on January 22, 2023 while taking a walk through his neighborhood an unmarked vehicle was parked at the entrance of J. Crockett's subdivision.

29. As such, J. Crockett sent an explosive email detailing shocking scandalous details and provided an unprecedented insight into the public corruption of the Security Division within the Orange County Convention Center on Friday, February 24, 2023 at 1207 hours. In fact, William Ross, the Chief Union Steward of Local 517 was copied on the email. To be fair, the email was titled, "Subject: Workplace Violence Allegations" and the following information was put in writing by the undersigned in the body of that email: "*As discussed, I'd like to emphasize my assessment for this 'fitness-for-duty examination' that is being initiated by the County. As you may or may not know, I was placed into an ADA accommodation for wearing a doctor approved face shield in lieu of the traditional face mask, despite performing all of my regularly assigned job duties with a face shield and authorized medical bandana at the time, prior to being segregated into an ADA Post under the guise of an ADA Accommodation. In addition, I wasn't expecting to be further targeted and slandered, much less segregated after I submitted my medical paperwork. In fact, I submitted this ADA request due to verbal threats of disciplinary action by Isiah White Jr., Sandra Dailey and Charles Young over the face covering issue.*

30. As a continuation, *On March 3, 2022, the mask mandate was lifted for vaccinated employees only and then fully lifted for all employees on March 4, 2022; however, I remained in my segregated status with no change amidst the rapidly evolving COVID-19 pandemic, which added more fuel to the fire among my coworkers; thus, enhancing the toxic workplace conditions that I've described in vivid detail that seem to be conveniently overlooked consistently. Furthermore, I disclosed to you that the Office of Professional Standards (OPS) is wholly corrupt to the core; a prime example is the gross cover-up by Senior*

- 15 -

*Investigator Maria Ventura with OPS involving the Charles Young scandal that unfolded in 2019. Hence, why my 'faith' in such a compromised entity is entirely 'non-existent' as OPS has no interest in government accountability; it's simply a front, an entity that fills the void; yet, it's true purpose is to preserve the status quo, which is to maintain a perpetual state of darkness. Furthermore, I had a stellar reputation, prior to my name being ruined by a corrupt network of Masonic agents (county officials) operating under the guise of serving the public who have capitalized off the COVID-19 pandemic and other gullible county officials to engage in blatant slander and defamation of character against me in an attempt to keep me silent and ruin my credibility permanently. For clarity, hindsight is 2020 and I find it suspicious I am given instruction not to discuss this investigation with anyone, except those whom I am legally authorized; yet, it was at least one county official who was involved in me being 'relieved of duty' who discussed the parameters of my situation with my peers enhancing the toxic workplace conditions, as I was contacted by coworkers over this scandalous 'workplace violence narrative.'*

31. Unfortunately, Sr. Human Resources Advisor Hector Lopez simply responded to that email on Friday, February 24, 2023 at 1335 hours with the following in the body of his email: "*Thanks. As a friendly reminder, the appointment is this coming Monday, February 27, 2023 at 12:15 PM 269 S. Orange Avenue, Orlando, FL 32806.*" Unfortunately, J. Crockett's employment concerns weren't relevant; thus, ignored by Human Resources.

32. Subsequently, on March 1, 2023 at 1216 hours, the undersigned received an email from Sr. HR Business Partner Hector Lopez and he stated in

the body of the email: *"Good afternoon. Please know that you have been cleared to return to work. You will report to work on March 5th for your normal/old assignment in Hall A garage. On Monday, March 6th Mr. Daniel Brady will meet with you to discuss beginning your training to transition to full-regular duties. As a friendly reminder, please follow the grooming rules for the Convention Center."*

      33. In other words, Human Resources was complicit along with the Security Division in targeting J. Crockett over an alleged unacceptable professional appearance due to his type of hair in relation to his color, race, national origin and sex. In fact, J. Crockett's words were completely dismissed and the cycle of lawlessness continued. In conclusion, J. Crockett met with Security Manager Isiah White Jr. (black); Security Supervisor Daniel Brady (white) and Assistant Security Supervisor Charles Young (black) on Monday, March 6, 2023 in the International Conference Room. Quite frankly, the blatant discrimination is humiliating; however, a bombshell revelation was disclosed by Isiah White Jr. (black) who said, *"So, uh, Crockett you were out uh due to a medical accommodation at a request due to COVID and your inability to wear a mask. So, your assignment was at the Hall A Booth."* Unfortunately, Isiah White Jr. (black) overtly lied about the alleged pretext as J. Crockett was stripped of his dignity, with his radio, utility belt, shield and ID badge being taken away on Sunday, January 22, 2023. Even so, the Mask Mandate was lifted on March 4, 2022; thus, COVID-19 is a bogus "pretext", but the reality is, prior COVID-19 disciplinary actions were used to justify the continued discrimination against Joshua Crockett over his type of hair in relation to his color, race, national origin and sex; thus, Orange County strategically retaliated against him.

- 17 -

34. <u>As a result, Daniel Brady (white) sent an email to the undersigned about the meeting on Monday, March 6, 2023 at 1306 hours which was titled, "Subject: Return to Rotation" and in the body of the email: "*Security Representative Crockett, The purpose of this memo is to recap the meeting we had to discuss the return to full rotation, at 12pm in the International Conference Room. Security Manager Isiah White, Assistant Supervisor Charles Young and myself were present. We are moving forward with the plan to assign you back into the full day-shift Security Rotation, effective Tuesday 3/14/23. We are assigning you to Senior Security Representative Robert Estevez, to give you the (1) month new hire FTO training, due to this training we are giving you notice to change your schedule to training with Senior Rep Estevez to work Tuesday through Saturday for this month, so your first day of work will be Tuesday 3/14/23. After this training, you will return to your normal schedule to be off Friday and Saturday. We have also discussed the Uniform and Grooming policy, which is attached (also given to you in person). This Policy was approved on 10/24/22.*"</u>

35. <u>As such, J. Crockett contested this email by writing a reply titled, "RE: Return to Rotation" and in the body of the email: "*To clarify, there were verbal statements made which are grossly inaccurate; first, Mr. Isiah White Jr. stated, 'you were out due to a medical accommodation' which is a blatant lie. Information was verbally communicated in a questionable manner by Isiah White Jr., in particular the question about being assigned to the Hall A Booth due to COVID-19. Yes, that is correct, but the opening statement about the reason for me being out is pure disinformation. Secondly, per Daniel Brady, 'um, this week is kind of grace period because you know you were out and now*</u>

*you're back, but when you start work on that Tuesday, we expect you to be in compliance with uh that grooming policy and you do have two options. Uh, if you feel you don't agree with it or if you have um you can get with HR and get an ADA accommodation or waiver for religious or cultural reasons, but that waiver has to come from HR."* Yet, Isiah White Jr. said, "*It has to be in a ponytail gathered up, but right now the way you wearing it is not within uh policy so uh here at the convention center uh we wanna, we, we have a level of professionalism when we dealing with the public that we need, we need to meet and as, as required of any other security rep we really need you to be in compliance to help us out with that because right now you're not in compliance with your beard and your hair wearing it out on your shoulders. So, um again, you can reference, I'm looking at your ID badge right in front of us um you have it pinned up on that.*"

36. In the same email discussed above in [paragraph 35], J. Crockett added: *"I should emphasize, that I, Joshua Crockett was hired as an on-call console operator on January 5, 2016 with this natural ethnic rugged appearance which by the way has not affected by ability in any way, shape or form to efficiently perform the duties of that position, which was carried out with a high degree of professionalism and integrity. Furthermore, I was selected for the Security Representative position with the same appearance features as described above on September 26, 2016 without my appearance ever being a factor for continued employment. In addition, I successfully completed my 6 month probation with these unique appearance features without the probation being extended or any conversations about my appearance being unacceptable and/or lacking in a level of professionalism. Thirdly, a quick analysis of my*

*annual evaluations will reveal that my appearance has been a non-issue and when it was mentioned, my notes on the matter were specific, 'pre-existing issue.' Honestly, I'm tired of being harassed about non-issues such as this alleged appearance issue, while enduring ongoing discriminatory animus. Therefore, I, Joshua Crockett will perceive this as further harassment, discrimination and retaliation if any disciplinary action is taken against me for this natural ethnic rugged appearance that I've maintained throughout my employment with the Orange County Board of County Commissioners without an accommodation in effect for it.*"

37. As discussed in [paragraph 35-36] in the body of that email: "*As of today, there still remains one fraudulent accusation on my employee personnel file that is blatant disinformation and if this discriminatory animus continues under the alleged pretense of policy that was never acknowledged and/or adhered to by Security Management then the motive is clearly established which is blatant willful retaliation. In fact, my natural ethnic rugged appearance was a non-issue until the COVID-19 allegations failed to be sustained against me which again clearly establishes beyond a shadow of a doubt that the motive is the termination of my employment with the Orange County Board of County Commissioners. I am only referring to the scandals of public corruption I've been embroiled in personally since I first reported such harassment, discrimination and retaliation. The fact of the matter is, I am a targeted individual - I shouldn't be writing these emails, but the County is determined to find anything to stick on my employee personnel file painting me as some sort of danger to the public and to my peers which is absolutely unprecedented and uncalled for - yet that narrative of disinformation crumbled*

*42 days later. Truthfully, I wasn't expecting to be put under investigation under the pretense of 'workplace violence' on Sunday, January 22, 2023, but it happened anyway. My reputation on the job has been utterly crippled between the Charles Young scandal, the segregation in November of 2020 over the mask exemption and then the blatant escalation over my sincerely held religious objections to COVID-19 inoculation and testing measures. As you know, the segregation and toxic workplace conditions remain unresolved."*

38. Even so, as a continuation of that email, J. Crockett added: "A*s of this writing, I understand why Isiah White Jr. has asked me in the past more than once this question, 'what would you rather win the war or the battle?' In his mind, this is the endgame with me and I've come to this realization. To put this into perspective, since I filed my harassment and discrimination complaint with OPS over the Charles Young scandal it has been 3 years, 3 months and 6 days not including today. In 42 days from the date that OPS complaint was filed, Sr. Investigator Maria Ventura determined that there were no policy violations, despite the plethora of evidence to the contrary. No witnesses were interviewed, no investigation was conducted, the county policies that were clearly violated were apparently defined as exclusively 'managerial in nature.' To make matters worse, after being needlessly segregated over the mask mandate, I submitted my sincerely held religious objections to COVID-19 inoculation and testing as required in a timely fashion on August 26, 2021 only to be strategically and intentionally targeted due to my previous complaint filed with OPS. Ultimately, I wasn't important, my words were ignored; thus, I had to endure more blatant discriminatory animus against my religion, color, disability, race/national origin, including harassment and retaliation."*

39. To reiterate a key point, this explosive email was sent on Friday, March 10, 2023 at 4:34 PM EST by J. Crockett as covered in [paragraph 35-38] to former Security Supervisor Daniel Brady (white) and the following individuals were copied on that email, including Orange County Mayor Jerry Demings (black); Orange County Attorney Shonda White (black); Security Manager Isiah White Jr. (black); Assistant Human Resources Director Reginald Davis (black); Assistant Security Supervisor Charles Young (black); Administrative Assistant Linda Hall (black); Chief Union Steward of Local 517, William Ross and the entire Orange County Convention Center Human Resources staff. Unfortunately, the officials named herein with the exception of William Ross continued to perpetuate the lawlessness against Joshua Crockett; thus, refusing to take action.

40. As a result, the willful inaction by Orange County officials resulted in J. Crockett being subjected to a violent outburst by a coworker which was a clear example of workplace violence. As such, on Thursday, March 16, 2023 at 4:51 PM EST an email was sent to former Security Supervisor Daniel Brady (white) with Isiah White Jr. (black); Assistant Security Supervisor Charles Young (black), including Human Resources who were copied. In essence, J. Crockett sent an email titled, "Re: Workplace Incident" and in the body of that email: "*After we spoke in your office, I started to reflect on all the incremental details that led up to that shocking unprovoked outburst against me in the Security Breakroom. After further analysis, I was able to recreate the construct of what actually happened gradually leading up to that incident at 12:45 PM EST on Wednesday, March 15, 2023. It should be noted, within the past 16 hours that I worked with him, Mr. Estevez mentioned to me that he was never offered any grief counseling nor were the other Security Representatives who were involved*

_in the incident involving a contract security lady who died while they attempted to resuscitate her at the Orange County Convention Center. Mr. Estevez emphasized in great detail that the woman's tongue was sticking out and her eyes rolled into the back of her head - completely lifeless_."

41. As a continuation of that in [paragraph 40], J. Crockett added: "_The second alarming conversation, I recalled with Mr. Robert Estevez occurred between approximately 0815-0930 hours on Wednesday, March 15, 2023, while I was walking with him either on the 4th floor or the 3rd floor of Central Lobby right at the balcony edge overlooking the terrazzo floor of Central Lobby facing the exterior glass doors to Traffic Position 5, nearby Electrical Room 88. I didn't document this right away, as I initially assumed this was an isolated incident; however, what alarmed me was Mr. Estevez's dark sense of humor. I followed him to the balcony edge, he looked down at the terrazzo floor and I'll paraphrase what he said, 'if you fell down from here you'd get a small headache, right?' I looked at him in disbelief, but to maintain a sense of order, I looked down and said, 'definitely more than a slight headache.' Mr. Estevez said, 'it wouldn't be good for your hair' which absolutely horrified me, but I dismissed it as his new sense of dark humor to maintain cordial relations. In light of the foregoing, these were two disturbing conversations described above over the course of two days working with him (less than 16 hours) which proves to me beyond a shadow of a doubt - there's a lot of underlying factors contributing to Mr. Estevez's verbal outburst against me. Hopefully, this additional information will add more clarity and context to our conversation and my subsequent decision to take a leave of absence for my safety_."

42. To put this email described above in perspective, J. Crockett sent an

email to former Security Supervisor Daniel Brady (white) on Wednesday, March 15, 2023 at 3:30 PM EST titled, "Subject: Workplace Incident" and in the body of that email: "*This email is in reference to our prior conversation, between approximately 1:05 PM - 1:39 PM EST in your office about alarming verbal conduct that was observed by this writer pertaining to Senior Security Representative, Mr. Robert Estevez. As I mentioned, I've worked with Mr. Estevez for years and I've never seen him flare up like this in my professional career with Orange County. As a result, Mr. Estevez's words, 'go ahead and record me and see what happens' was perceived by me as a possible indicator of workplace violence. Prior to that verbal statement above by Mr. Estevez, he made a number of verbal statements that were concerning, which undermined my progress in this training capacity, as I was verbally belittled. Nevertheless, I'm concerned for my safety and I won't be into work for the remainder of this week until this issue is resolved. Although, Mr. Estevez's questionable conduct occurred in less than a minute at 12:45 PM EST, I feel safer taking the rest of this week off in the interim until a resolution and/or clarity on his outburst is rectified.*"

43. Unfortunately, J. Crockett's words in those emails were not taken seriously. In essence, J. Crockett was subjected to direct discrimination and a hostile work environment by the inaction of former Security Supervisor Daniel Brady (white), Security Manager Isiah White Jr. (black) and Human Resources, where a higher ranking officer openly expresses joy at the possibility of Joshua Crockett's death if he were to somehow fall to his demise at the Central Lobby balcony edge. Nevertheless, for a Sr. Security Representative to make such a disparaging comment with malice by saying, "*it wouldn't be good for your hair*"

speaks volumes, for such a public official to express such a dark fantasy about Joshua Crockett falling to his demise is truly a form of depravity that shouldn't be remotely tolerated. To make matters worse, Robert Estevez (brown) isn't placed under investigation for workplace violence nor is he subject to any adverse employment actions for such reprehensible conduct. Again, the undersigned doesn't have the luxury of color privilege unlike his peers. In conclusion, the undersigned's religion, sex, perceived disability, national origin, race and color are obviously unacceptable to the point where Orange County Government openly condones such lawlessness as the undersigned was subjected to a severe incident of workplace violence by Sr. Security Representative Robert Estevez. Ultimately, J. Crockett informed Mr. Estevez his conduct will be recorded and then the threat is further amplified by Mr. Estevez who says, "'*go ahead and record me and see what happens*" after his violent and aggressive outburst which prompted J. Crockett's advisory to Mr. Estevez of recording his dangerous behavior; however, this dangerous behavior was tolerated and endorsed by Orange County Government as the inaction was horrifying.

44. Shockingly, J. Crockett was unlawfully disciplined on Wednesday, March 15, 2023 for an alleged failure to maintain a "Productive Work Environment and Standards of Behavior, OCCC Image Manual - Attitude, Orange County Code of Ethics for all County employees, LIUNA 20.7 A.2 and LIUNA 20.7 K.4." In fact, in that documented verbal/oral warning, under the "Action Plan to Resolve Problem" section of the paperwork it stated, "*Interact with supervisors in a polite and professional manner*" with a date of incident of 1/19/23. In essence, Security Management was using the email I sent on January 19, 2023 exposing their lawless acts as an incognito form of retaliation,

but were hopeful their threats of intimidation and lawlessness would be successful. However, their lawless acts failed to net their desired results and subsequently 55 days later, J. Crockett is subjected to a documented verbal/oral warning which confirms the entire premise had nothing to do with the EG2 Grooming policy, but everything to do with engaging in discrimination against him for being an outspoken male ("sex") Chippewa Indian ("national origin"), who also openly celebrated his European background ("race") given the texture of his hair. Moreover, the key to this entire sinister plot was to use the white whipping boy former Security Supervisor Daniel Brady (white) to knowingly and willfully carry out these acts of malfeasance against J. Crockett under the color of law. Quite frankly, what are the odds, that J. Crockett would be subjected to workplace violence by Orange County Government's appointed Sr. Security Representative Robert Estevez on the same day J. Crockett is charged for not interacting with supervisors in a polite and professional manner? If there truly was a violation of County policy, why did the cronies in the Security Division wait 55 days later to charge J. Crockett with a baseless violation of policy?

45. Upon the undersigned's return to work on March 21, 2023, the undersigned was unlawfully disciplined again this time for the following: "LIUNA 517 (20.7)(A-1)(K-6)" and in the "Situation" section of the paperwork: "*On the 21st of March at 6am, Security Rep Joshua Crockett reported to work with his hair on his shoulders, which is a violation of EG2- Uniform and Grooming policy. His beard and mustache are longer than an inch, the policy states 'no longer than one-half inch. Mr. Crockett has been issued copies of the EG2-Grooming policies by Security Supervisor Daniel Brady and I. Failure to not be in compliance with policies may result in progressive discipline, up to and*

*including termination.*" SUMMARY OF PRIOR DOCUMENTATION-Continued 8 Oct, 2021 -Oral Warning, Oct 15, 2021 - Written Reprimand." As such, given this shocking disclosure, Orange County Government inadvertently confessed in writing that J. Crockett's perceived disability over wearing the face shield and bandana during the mask mandate at the Orange County Convention Center in relation to the COVID-19 protocols was still a problem, despite these bogus charges allegedly being rescinded. In fact, J. Crockett's religion of being a Follower of Yeshua HaMashiach was also a problem for Orange County Government, despite these COVID-19 charges allegedly being rescinded which were still applied against J. Crockett which were used to justify his unlawful termination with Orange County Government which was pure discrimination and retaliation.

46. Unfortunately, on March 22, 2023, the undersigned received a documented written reprimand which cited Contract Article "LIUNA 517 (20.7) (A-1)(K-6)" and "Security Policy Manual EG2 (D-3)(4a,b,c)." As such, in the "Situation" section of the paperwork, the following was documented: "*On the 22nd of March at 6am, Security Rep Joshua Crockett reported to work with his hair on his shoulders, which is a violation of EG2-Uniform and Grooming policy. His beard and mustache are longer than an inch, the policy states 'no longer than one-half inch. Mr. Crockett has been issued copies of the EG2-Grooming policies by Security Supervisor Daniel Brady and I. Failure to not be in compliance with policies may result in progressive discipline, up to and including termination.*" SUMMARY OF PRIOR DOCUMENTATION-Continued 31 Jan 2022 - Oral Warning, 8 Oct 2021 - Oral Warning, 15 Oct 2021 - Written Reprimand." In conclusion, Charles Young (black) included two of the previous bogus COVID-19 charges that were allegedly rescinded, but also included

the other bogus COVID-19 charge that had a date of incident for January 31, 2022 which was issued due to J. Crockett allegedly not being certified to use county equipment, but this bogus charge was issued exactly 3 days after the alleged COVID-19 charges appeared to fail which pertained to J. Crockett's failure to test for this mystery virus and be vaccinated.

47. Inevitably, Orange County Government presented a manufactured document with J. Crockett's name not listed for being golf cart certified, but J. Crockett has an email in his possession that he received on Monday, March 21, 2022 at 2:34 PM EST which was communicated by the Senior Safety and Loss Prevention Analyst John McElwee with Orange County Risk Management which conclusively proves that J. Crockett is certified to use county equipment. As such, the question that should be asked is, what did J. Crockett do to warrant government officials altering documents which resulted in successfully ousting an honorable public servant?

48. Importantly, the evidence is so shocking that J. Crockett literally predicted the future before it happened by writing in an email that was sent to Human Resources on November 22, 2021 at 11:44 AM with the subject line, "RE: Grievance Issue - (COVID-19 Allegations)" and a key excerpt will be shared, in the body of the email: "*In light of the foregoing, I've seen government records conveniently altered/falsified in order to promote some sort of sinister plan to oust me personally and/or to protect other management officials, I wish I could say I was surprised by these types of crafty maneuvers, but sadly I've come to expect it.*" Moreover, this prophecy came to pass exactly 82 weeks later when J. Crockett was unlawfully terminated on June 19, 2023. Thus, he ("Mr. Crockett") was fired due to his unacceptable hair texture in relation to his national origin,

race and color.

49. Inevitably, on March 28, 2023, J. Crockett received a "Notice of Pending Disciplinary Action" and in that document one of the violations cited is "401 - Productive Work Environment and Standards of Behavior" and one of the lines is: "*Employees shall in no way act in any manner which may discredit the County government, public officials, fellow employee(s), or themselves.*" In essence, exposing public corruption and engaging in protected activity is a policy violation which is absolutely ridiculous; thus, Orange County retaliated against Joshua Crockett even though he reported discrimination based on his type of hair in relation to his color, race, sex and national origin via email.

50. Importantly, J. Crockett attended a Step 1 Grievance Hearing with Security Manager Isiah White Jr. (black); Senior Human Resources Business Partner Tarlalyn Brown (black); Senior Human Resources Analyst Ivonne Torres-Serrano (brown); former Security Supervisor Daniel Brady (white) and Chief Union Steward of Local 517, William Ross. In conclusion, Isiah White Jr. (black) sent a letter to the undersigned on April 27, 2023 with the subject: "Step 1 Hearing Results, Grievance #12678" and to paraphrase the document, Mr. White (black) denied the grievance, refusing to remove the unlawful disciplines and honor the remedy of remote work. As such, J. Crockett contested this decision which was subsequently escalated to a Step 2 Grievance Hearing.

51. During the Step 1 Grievance Hearing conducted on May 10, 2023, Security Supervisor Daniel Brady (white) said, "*the policy is the policy, the, the, we have for our entire division and you know the and I'd refer back to Mr. Crockett's photo ID when he was hired here his appearance was in compliance with the Uniform and Grooming policy and now it is not.*"

As such, the undersigned responded, "*I'd just like to add, one little piece to that - when were you hired, Mr. Brady? Correct me if I'm wrong, wasn't it March 23rd 2022? Does that sound about right to you?*" In fact, Security Supervisor Daniel Brady (white) said, "*yes sir.*" In conclusion, the undersigned said, "*So, how can you make an assumption or statement that I was in compliance with something when you weren't even here in 2016 at the Orange County Convention Center?*" Ironically, William Ross said, "*Wow.*"

52. Even so, in the same Grievance Hearing as discussed in [paragraph 51], Security Supervisor Daniel Brady (white) said, "*Well, I'm gonna refer back to Mr. White (black) because he's the one conducting this hearing that's..*" Isiah White Jr. (black) said, "*right, so Joshua um when I look at your ID when you were hired* (interrupted) *let me, let me finish what I'm saying, when you were hired um Joshua we have a photo of what you looked like in your ID, your county identification. So, um when we saw your county ID, um it doesn't matter who we're looking at, what the way you were employed here and what you looked like at that time from a grooming perspective. So, that's that.*" As such, William Ross responded, "*And then if you notice, Mr. White, I just attended a function at the Convention Center where everybody was fully in uniform, I seen beards half-way down their chests, I seen long hair down to backs and you cannot alienate and said that shirt is not a uniform when it clearly states Orange County Convention Center which is purchased by Orange County Convention Center and no employee can not come out there without putting on that shirt or putting on the pants that the Convention Center provides. So, that's also part of the uniform, shouldn't you be lobbying, if you're going to try to enforce this rule, shouldn't it be county-wide throughout the Convention Center*

1    *cos all of them plays a part to visit the public?*

2         53. As a continuation of [paragraph 51-52], William Ross added: "*And*

3 *here, this sounds like again, as I stated earlier, this is more so, like it's personal*

4 *because this is not being enforced throughout the whole Convention Center and*

5 *everybody wears a uniform and you and everybody beards are down to their*

6 *chests, their hairs all over the place, but I don't see any of this stuff being*

7 *enforced, but what I do see is - you alienating one individual and not even taking*

8 *into consideration of his heritage, his Chippewa heritage. You cannot alienate*

9 *one individual for their hair if you don't go after the whole Convention Center*

10 *for their whole dress code appearance cos the whole dress code, [sic] all of them*

11 *out of dress code, every last one of them. And you know, I was just there, as a*

12 *matter of fact, I even saw one of your security reps with their hair pinned up*

13 *and the ponytail was still hanging on the back of their clothes, but yet still*

14 *nothing was said to this individual. So, if you're going to address one individual,*

15 *you need to address each and every last one of the individuals within your*

16 *department and I don't see that right now. I see you alienating one individual*

17 *and this is become too personal and this situation has to stop cos if you're going*

18 *to go after the dress code, let's go after the whole dress code throughout the*

19 *whole Convention Center cos all of them are out of compliance*.

20         54. Nevertheless, in rebuttal, William Ross stated, "*but yet still you're*

21 *trying to enforce a dress code that's not enforced county wide, this is more of a*

22 *personal vendetta. And again, as the other two individuals I just mentioned,*

23 *have those other two individuals been approached, have those other two*

24 *individuals been given uh documented verbals and [sic] even brought in to*

25 *discuss? No.*" As such, Isiah White Jr. (black) said, "*we're addressing Joshua*

*Crockett today."* As such, the undersigned responded*, "So, and just to emphasize a key point, it's very obvious what this is: as I've made myself very clear, I'm a targeted individual and everybody can see it very clearly for what it is and it's blatant retaliation. It's all of these things I've been exposing and pointing out for years now, that's the scary part about it, for years. This isn't something that just happened overnight, it's been ongoing for a very long time and I just, I'm at a loss of words, it's just pure quid pro quo, public corruption, cronyism and everything in between they could ever ask for."*

55. As a continuation of [paragraphs 51-54], J. Crockett added: *"The writings on the wall and so, you know I get tired of saying the same things over and over again, but it's just pure corruption and unfortunately, you're at the very top of the pyramid, Mr. White because it all starts with you and it rolls downhill. These issues were brought to the attention of Human Resources long before it became an issue. Because again, anybody can see the train coming down the tracks a mile away, you can hear it audibly, you can see it visually and here we are. And so, I refute all of these bogus fraudulent accusations that have been levied against me for years now and it's just been piling on, one scandal after another. It's pure lawlessness, period.*

56. Nevertheless, the Step 2 Grievance Hearing #12678 was conducted on May 24, 2023 via video with the hearing officer, Executive Director Mark Tester (white); Security Manager Isiah White Jr. (black); Senior Human Resources Business Partner, Tarlalyn Brown (black); Senior Human Resources Analyst, Ivonne Torres-Serrano (brown); Chief Union Steward for Orange County, William Ross and Security Representative Joshua Crockett (white) for the Orange County Convention Center. Thus, J. Crockett's opening statement began with:

- 32 -

*"Good afternoon, everyone. So, unfortunately, with this situation that's been taking place with the alleged grooming policy issues. So, more or less, all of these issues leading to the uniform and grooming alleged violations that have taken place supposedly, according to Mr. White - this all stems back into a 7% out of class pay issue back in July of 2019 involving a current Assistant Security Supervisor, Mr. Charles Young. Unfortunately, it transitioned into 2020 which as you know, March 11th was when COVID-19 was declared a pandemic. And so, that led to a whole host of other issues. And so, I had to endure civil rights problems that resulted from that."*

57. As such, as covered in [paragraph 56], J. Crockett added: "*Fast forward into 2023, my appearance became an issue, now of course, almost an entire year of taxpayer resources and money was spent coming up with a new grooming policy to specifically target me cos there's only one Joshua Crockett at the Orange County Convention Center in Security. And so, at the end of the day, this is a personal vendetta by Mr. White (black) and it involves all the protected characteristics under Title VII of 1964 such as; color, national origin, you name it, sex, gender discrimination.*" Of course, Isiah White Jr. (black) said, *"Um so, uh the grooming policy is something that's not that's specific to Joshua Crockett uh every security uh personnel in security is required to follow the, all policies set forth by this division. So, um the policy is what it is, it applies to whether you a male or female or regardless of your gender or race uh ethnicity and so forth. So, we just expect Joshua to follow uh the policies that's, that everyone else is following and um and also if he would just uh basically follow what he was what he looked like when he was hired as an employee of Orange County in security um this entire process would just go away that's it for me.*"

58. <u>Of note, Isiah White Jr. testified in this hearing as covered in [paragraphs 56-57] that the EG2 Grooming policy reissued on October 24, 2022 applied to "everyone else" in the Security Division regardless of their gender, race, ethnicity and so forth. In contrast, Isiah White Jr. lied under oath in a separate hearing with the Florida Division of Administrative Hearings ("DOAH") in case #22-3897 before Judge Bruce Culpepper and claimed this EG2 Grooming policy only applied to Security Representatives. As such, J. Crockett is right: why are other security personnel in violation of the EG2 Grooming policy, but outside of J. Crockett's protected classes in relation to color, race, sex and national origin exempt, but J. Crockett isn't? Ultimately, the answer is simple: J. Crockett doesn't qualify for the Black Privilege exemption and isn't the same race, national origin or sex as the females in violation of the same EG2 Grooming policy.</u>

59. <u>In the same Step 2 Grievance Hearing as covered in [paragraphs 56-58], William Ross said*, "As of 10/22, when this policy was implemented, was Mr. Crockett still coming to work in uniform in his appearance as it stand now?"* As such, Isiah White Jr. (black) responded, *"So, so Mr. Crockett um was in an alternative duty position uh as he requested a medical ADA accommodation. And so, at that time, he applied through HR for a medical ADA accommodation and which they was sent to me, I reviewed it and he was temporarily assigned to the Hall A Parking Garage in that position. So, the answer is yes, he was coming to work, but he was assigned to the, to the uh guard booth outside of the facility."* In rebuttal, William Ross responded*, "but again, that does not answer the question, was he in violation of this policy, yes or no?"* As such, Isiah White Jr. (black) responded, *"yes, he was."* In brilliant fashion, William Ross questioned Mr. White (black) again, *"OK, why wasn't it*</u>

1    *enforced at that point in time*?

2          60. Moreover, as a continuation of [paragraphs 56-59], William Ross

3    added: "*Um again, if this policy was put in place in 10 of 22' and Mr. Crockett*

4    *(white) was coming into work in full uniform which is clearly stated that he was*

5    *in violation of his policy, a violation of the policy. Why wasn't this not addressed*

6    *and why was it not even enforced until Mr. Crockett (white) was put back into*

7    *rotation? I think through the course of time, we've clearly um shown that this*

8    *has been a personal agenda and my thing is, why wasn't it enforced if it was*

9    *such a issue and when I come out to the Convention Center and I notify them*

10   *that's when I'm out there and when I see employees that's in regular Orange*

11   *County uniform that says Orange County, the Convention Center and it is a*

12   *uniform, but when I see their dress code, I see their appearance and I know that*

13   *they mingle with the public, you know when the public is out there. Uh I'm just*

14   *lost for words that we're here at a waste of taxpayer money for something as so*

15   *frivolous as hair and a beard when we got individuals out there walking around*

16   *with beards half-way their chests, but yet still they mingle with the customers*."

17

18         61. In esponse, Isiah White Jr. (black) responded, "*OK, yeah, he's in*

19   *violation when he returned to duty, he was in violation when the policy was*

20   *issued in October of 2022. However, due to his alternative assignment, where he*

21   *was assigned, his whole workday included him being inside that guard shack*

22   *that it didn't become um a issue until he reported back to his regular uh*

23   *assigned duties as a security representative.*" As such, William Ross said, "*OK,*

24   *Mr. Tester, you've just heard he's admitted that this was never an issue until*

25   *Mr. Crockett returned back to his regular assigned of duty, which makes this a*

26   *clear violation of his heritage, it's discriminatory, discrimination*.

As a continuation of [paragraphs 56-60] J. Crockett responded, *"OK, so I'd like to make something very clear on the record, we did have a console operator that used to work in the security division, who recently left, her name was Frantese Gordon. She's known for having dreadlocks all the way down to the rear end, in the back. Now my question is, was there any disciplinary action issued to her for that violation of the policy?"* In reply, Isiah White Jr. (black) said, *"I don't know, because we can't prove what you're saying to be facts because she's no longer here."*

62. Yet, as a continuation of [paragraphs 56-61], J. Crockett added: *"Alright, so this is also for the record, this is a question to Mr. Tester (white). Did you know that on September 23, 2022 that Mr. White (black) testified under oath to the State of Florida acknowledging that Security Representatives were permitted to have long hair? Now this partial statement, interestingly enough, Mr. White (black) said, 'it had to be tied back in a ponytail according to Orange County policy.' Now I would love for Mr. White (black) to provide this information to clarify that, but I do find the timing of September 23rd with this disclosure to the state during the course of a civil rights investigation and then the new policy goes into effect 31 days later on October 24th."* Nevertheless, Executive Director Mark Tester (white) responded, *"your, your asking me a question, the question is was I aware that Mr. White (black) made a testified to the state regarding security guards being able to have long hair which was 9 days or so before after I think, no I was not aware that Isiah, Mr. White (black) testified to, to anyone uh at the state. So, no I was not aware of that."* As such, Isiah White Jr. (black) responded, *"and I'm not aware of what he, what, who he's talking about, I don't know, I'm not aware of it either."*

- 36 -

63. *In conclusion, Isiah White Jr. (black) overtly lied on the record on video with visual and audio, despite the direct evidence of his signed affidavit to the State of Florida. Yet, Judge Bruce Culpepper erroneously finds Isiah White Jr. credible in a separate hearing in DOAH #22-3897, despite Isiah White Jr's many falsehoods, inconsistencies and blatant lies under oath. Let's not forget, Isiah White Jr. didn't say Frantese Gordon was exempt from following the EG2 Grooming policy. Instead, he claimed there was no evidence of her in violation of the policy, but the undersigned presented direct evidence in a previous hearing with the Florida Division of Administrative Hearings and Isiah White Jr. provided new conflicting testimony in that hearing that the EG2 Grooming policy didn't apply to her, even though it did.*

64. As a continuation of [paragraphs 56-63], J. Crockett responded, "*Thank you, now my next question is, this is to Mr. White (black) is, do you know how many years I've been adhering to this tradition of Chippewa heritage with this hairstyle?*" In reply, Isiah White Jr. (black) said, "*Well, I know when you were hired as I could look at your ID badge that you possess that when you were hired that your hair was tied back behind uh your head and was off your shoulder. Your beard was neatly trimmed and uh you did not look the way you look now and then second, I never knew that you were a Chippewa or any ethnicity. I wouldn't have known that uh from the time I got here I never knew that. And um, and my question to you is in your employee file, cos again I wouldn't necessarily know that, Joshua. Um I don't know if you recognize that upon you being hired um, but I don't know, I didn't know any of your heritage background.*" As such, J. Crockett responded, "*So, on one hand, you're saying that you knew it was tied back and off the shoulders and what have when you*

*were not an employee in 2016 with the Orange County Board of County Commissioners, but at the same time, you're saying you're unaware of my Chippewa heritage, yet you testified under oath to the State of Florida for the investigation that you did know about my Chippewa heritage - that's interesting."*

65. Of course, as a continuation of [paragraphs 56-64], Isiah White Jr. (black) responded, "*I don't know what you talking about.*" Again, Isiah White Jr. testified under oath to the State of Florida about having knowledge of Joshua Crockett's Chippewa heritage. As such, he lied again, which isn't surprising, but expected at this point.

66. As a continuation as covered in [paragraphs 56-65], Mark Tester (white) said, "*[sic] my answer to that would be, Mr. Ross would be that the question is, is I think [sic]. To answer your question is is is uh there are other people that that are outside of the, that you believe the, the policy, the dress policy um and my answer to that would be is, is each department has their, each unit has their own policy based on their specific uh requirements of their job um uh much much like the uniform and the badge um. And so, uh I do not see anyone in security that would be walking around in violation of the, of the, of the dress policy of, of, of the security unit.*" Therefore, Mark Tester admitted that he didn't see anyone in security in violation of the EG2 Grooming policy, despite looking directly at Joshua Crockett on video with his hair below collar and on his shoulders. Therefore, it was a confirmation that Joshua Crockett was clearly being discriminated against due to his color, race, sex and national origin due to his texture of hair. In conclusion, black females in violation of the same EG2 Grooming policy are exempt due to their Black Privilege, but J. Crockett isn't.

67. Ultimately, J. Crockett participated in a Step 1 Grievance Board to address Grievance #12684 on June 5, 2023 at 10:15 AM EST. Nevertheless, the hearing officer was Executive Director Mark Tester (white), also present Security Manager, Isiah White Jr. (black); Security Supervisor Daniel Brady (white); Tarlalyn Brown (black), Senior Human Resources Business Partner; Ivonne Torres-Serrano, Senior Human Resources Analyst; William Ross, Chief Union Steward and Joshua Crockett (white), Security Representative. In essence, Daniel Brady (white) provided an opening statement on behalf of the Security Division to justify the adverse employment actions taken against J. Crockett. As such, the J. Crockett provided his opening statement: "*Good morning everyone, so to reiterate what I've mentioned previously, unfortunately, this is a vicious witch hunt. So, to clarify, everything that's happened leading up to this point in reference to this alleged violation of the grooming policy. It should be emphasized that all of these issues can be traced back to a certain period in time and unfortunately for me in my particular situation it all started in July of 2019 involving 7 percent out of class pay with Assistant Security Supervisor, Mr. Charles Young (black) and then of course, that snowballed into November of 2021 with saliva being spit into my face by this Assistant Security Supervisor and a major cover-up took place with Maria Ventura with the Office of Professional Standards*.

68. As a continuation for [paragraph 67], J. Crockett added: "*And so, more or less, what happened is, going into January of 2020 that investigation was kicked back at the Convention Center and of course it was delayed. So, by the time it came to have a meeting on that with Terry Devitt (white); Sandra Dailey (black) and Monica Woods (black). Well, now there, we're in the midst*

*of the pandemic, it's declared March 11th of 2020. And so, it got kicked back if I recall, almost a year or right at a year before we were able to address those issues and the worst part about it was - it was off the record. So, it was almost like it never even happened, what are the odds? And of course, while this is going on, I'm facing the unfortunate onslaught of COVID-19 measures that were implemented. And so, this was an opportunity for Security Management and Human Resources to collaboratively pummel me with measures that shouldn't have been taken - there was a much more ethical way to go about it*.

69. As a continuation of [paragraphs 67-68], J. Crockett added: "*And so, the moral of the story is: I get segregated, I become the de facto COVID-19 leper. Fast forward into 2021, with vaccination and testing and the rest is history going into 2022 with alleged golf cart violations with not being certified. And again, going into 2023 with the alleged appearance violations. And so, more or less, what it comes down to is, all I'm asking for is for all of these fraudulent nonsense accusations and charges that have been levied against my name to be completely eliminated. So, more or less, what I'm asking for is for all these fraudulent charges to be dropped. And secondly, to prevent this from going any further than it already has - honor the remedy that's on file. So, that way it's a win-win solution for both parties involved because ultimately what's happened is, laws have been violated*."

70. As a continuation of [paragraphs 67-69], William Ross responded, "*excuse me, concerning the physical fit for duty, I would just like to add that wasn't a physical fitness for duty that they sent Mr. Crockett to. They sent him to a shrink, they sent him to a psychiatrist to see was anything wrong with his head and come to find out that he's perfectly sane there was nothing wrong with*

*him. Now again, how is the uh relieve of duty with pay, what was that even* *warranted for an email and then to find out that the investigation was all* *fraudulent and then you sent him for a physical fit for duty and you sent him to* *a psychiatrist, a shrink of all people and come to find out there's nothing* *physically fit wrong with him. There's nothing wrong on the inside of his head.* *Again, how is management justifying the things that they are doing? How is* *this being justified? I don't see no justification in anything that has transpired* *since Mr. White (black) has started this personal vendetta against this one* *individual, one said individual.*"

71. Nevertheless, as a continuation of [paragraphs 67-70], J. Crockett responded, "*so with that being said, since it's going to be cut short, I just have to* *emphasize a key point on March 6, 2023, Mr. White (black) stated that I was* *out due to a medical accommodation which I find kind of ironic considering that* *he just mentioned here on this hearing that it was for a different reason. So, it's* *just, the bottom line is, there's a lot of lies, there's a lot of deceit, cronyism,* *government corruption, quid pro quo that goes on at the OCCC and you know* *there needs to be accountability. There needs to be a change and if you're not* *going to change and you're going to allow this stuff to continue to spiral out of* *control. There's the remedy, the suggested remedy is the solution - it's an* *interim fix to a pretty big problem, but that's, that's the only thing I can tell ya.*"

72. In fact, J. Crockett received an email from the Human Resources Manager Cindy Marsh with the City of Lakeland on May 19, 2023 to apply for the Director position at the RP Funding Center which would've been a substantial bump in pay for J. Crockett you know between $92,349.13 - $171,509.06 annually, but it proves that Mark Tester was complicit; thus, knowingly and

willfully engaging in lawlessness against J. Crockett over a formerly accepted professional appearance due to his type of hair. Quite frankly, why pull strings to dangle a carrot on a stick to a lowly Security Representative making $18.36 hourly to get him to abandon his ethnic origin and racial identity by eliminating Joshua Crockett's type of hair for the illusion to make a minimum of $48.10 hourly or more as the new Executive Director at the RP Funding Center? As such, it should be noted, the former executive director of the RP Funding Center Tony Camarillo was promoted to General Manager at the Orange County Convention Center directly under Mark Tester's authority overseeing the third largest convention center in the nation. Nevertheless, the truth is dangerous to any government that operates lawlessly; thus, it is written. To be fair, the timing is undeniable, but as far as front pay is concerned, the numbers above at the midpoint of $131,929.09 can be used and multiplied by the number of years to achieve retirement age. As such, J. Crockett is 31 years of age; thus, 34 years to achieve the standard retirement at 65 years of age at that annual rate of pay is: $4,485,589.23 in front pay.

73. Finally, Joshua Crockett participated in another Predetermination Hearing on June 15, 2023 at 1:18 PM EST with the hearing officer, Security Manager Isiah White Jr. (black); Daniel Brady (white) Security Supervisor; Ivonne Torres-Serrano, Human Resources Analyst; Hector Lopez with Human Resources and William Ross was present as the chief union steward for Local 517. Unfortunately, Isiah White Jr. (black) and Daniel Brady (white) continued their absurd crusade against the undersigned over the alleged policy violations under the guise of direct discrimination. As such, the undersigned responded, "*first of all, the alleged EG2 Grooming policy violations are fraudulent*.

*As I've expressed explicitly on multiple occasions, policies are enforced from day 1 not several years after the fact. Therefore, the EG2 Grooming was archaic and not valid according to federal and state standards if it conflicted with protected characteristics under Title VII of the Civil Rights Act of 1964. Nevertheless, this assessment is clear when the entire scope of my employment history is taken into consideration not a single photo which doesn't provide you with a 360 degree view of what you're looking at. With that being said, it should be noted, my prestigious reputation was targeted under the guise of COVID-19, despite the failed discriminatory animus to remove me from county employment under the guise of public health and bogus safety violations.*"

74. Moreover, as a continuation of [paragraph 73], J. Crockett added: "*However, security management under the leadership or more appropriately the regime of Isiah White Jr. (black) has successfully crippled my reputation to depths I never knew existed since I entered the workforce in 2012. As a result, a chasm, the likes of which I've never seen has come to fruition. I've seen families destroyed from the inside out which has adversely affected fathers, sons, mothers and daughters and other members of the extended family unit. I've witnessed the exponential growth of scientism as it became the official state religion during COVID-19. In other words, anyone who adhered to their sincerely held religious practices in opposition to the state's religion of scientism was deemed a biological threat as a COVID-19 leper and a heretic.*

75. As a continuation of [paragraphs 73-74], J. Crockett added: "*with that being said, in closing in order to be successful under Mr. White's regime, one must possess moral flexibility on the job. I've observed questionable characters get promoted, the Masonic affiliated Orlando Police Department*

- 43 -

*("OPD") cronies slide into promotions within the Security Division not based on merit, but based on connections with Mr. White (black) himself. And again, equal opportunity is a joke in Orange County Government, but at least the county can continue to mislead the taxpayer money and resources with fraudulent DEI initiatives known as; Diversity, Equity and Inclusion. And with that being said, if you're going to continue taking adverse action and bread out of my mouth. My recommendation is go ahead and finish the job and terminate me cos all this is, is financial torture. It's disrespect, I don't appreciate it and if you're gonna, if you truly believe all of this fraudulent nonsense that you levied against me then you will take action to eliminate the problem effective immediately, those are my final words."*

76. Unfortunately, on Juneteenth or June 19, 2023, J. Crockett was called to a meeting in the International Conference Room at the Orange County Convention Center. With this in mind, Assistant Security Supervisor Charles Young (black) refused to tell J. Crockett what the meeting was about as to whether or not it was disciplinary related or not. As such, upon arrival, J. Crockett was greeted by an Orange County sheriff deputy along with Senior Security Representative Malone Drakes (black) and Senior Security Representative Michele LaFleur (white) monitoring the undersigned outside of the International Conference Room with the expectation of workplace violence. To be fair, recognizing the ambush, J. Crockett engaged Isiah White Jr. (black) and documented it. As such, J. Crockett stated, "*if it's being discipline related, I have a right to union representation; as of now, [redacted], so go ahead.*" Nevertheless, Isiah White Jr. (black) said, "*OK, OK, give me my ID card. As of today, your employment here is terminated.*"

77. Moreover, as a continuation of [paragraph 76], J. Crockett said, "*it's terminated, OK.*" In response, Isiah White Jr. (black) said, "*yes, put our stuff on the uh on the table, you can take your gun belt off, I would like your keys.*" As such, J. Crockett stated, "*it's unfortunate.*" In rebuttal, Isiah White Jr. (black) stated, "*[redacted].*" In response, J. Crockett stated, "*no, I asked for union representation, I am a member of, I asked for union representation, you refused to do so.*" In rebuttal, Isiah White Jr. (black) said, "*this is not a disciplinary hearing.*" In contrast, J. Crockett stated, "*well, disciplinary is the same thing; termination is a disciplinary action, up to and including termination.*"

78. Of course, as a continuation of [paragraphs 76-77], Isiah White Jr. (black) ignored J. Crockett's words and said, "*do you have anything else in your locker or anything that we need to be concerned about?*" In rebuttal, J. Crockett stated, "*this is a disciplinary action for the record, which is up to and including termination. And again, this is unlawful termination, but it is what it is. I did ask Charles Young (black) as I was walking up here what this was in reference to and he said it wasn't disclosed to him.*" As such, Isiah White Jr. (black) said, "*um, so um your employment for uh the Orange County is being uh terminated as of today.*" In closing, J. Crockett was escorted by Orange County Deputy Burchfield (white) along with Sr. Security Representatives Malone Drakes (black) and Michele LaFleur (white) to his vehicle.

79. With this in mind, J. Crockett's civil rights were wholly violated by Isiah White Jr. (black) who was appointed as Security Manager II by Mayor Demings (black) and the Commissioners of Orange County; thus, Isiah White Jr. (black) acted with full legal authority under the color of law on behalf of that public agency to unlawfully terminate J. Crockett's employment contract.

80. In conclusion, Orange County Government violated J. Crockett's civil liberties in relation to the Fifth Amendment as Joshua Crockett's due process was wholly violated by a public agency ("Orange County"), a government entity whose Fourteenth Amendment power preempted the Fifth Amendment which subsequently violated Joshua Crockett's due process with the transfer of this case to the Middle District of Florida. Apparently, being a "Citizen Slave" is more important than overruling *International Shoe Company v. Washington (1945)* which is by far, one of the most ridiculous Supreme Court precedents that is still applied today towards "natural persons" like Joshua Crockett. Of course, nobody wants to upset the apple cart; thus, the status quo remains in full force and effect ensuring unparalleled power for the American Corporatocracy. Even so, the irony of a "shoe company" winning the battle for "personal jurisdiction" is quite prophetic, as it correlates to Daniel 2:43. In essence, the "corporate boot" is stamped on our necks. Yet, "natural jurisdiction" isn't recognized, even though J. Crockett presented a great argument for it which should override "personal jurisdiction." As such, the latter should only apply between two artificial entities; therefore, it is unjust to subject a natural person to the power of the unnatural corporate idol.

81. In true Orwellian form, Orange County Government officials in collaboration with their legal counsel schemed to label former Security Representative Joshua Crockett as a domestic terrorist and released an illegally obtained photograph of J. Crockett in a plague doctor mask while in uniform on July 7, 2023 exactly 18 days after J. Crockett's unlawful termination on June 19, 2023. In doing so, the mastermind behind this slanderous assault against J. Crockett's reputation is Security Manager, Isiah White Jr. with Orange County.

Even so, Isiah White Jr. emphasized his nearly three decades of law enforcement experience, including a secret security clearance to justify his slanderous assault against Joshua Crockett. In so doing, Mr. White abused his authority as an appointed official of Orange County Government by writing such a frivolous Dystopian narrative in his signed affidavit, but even embarrassed, manipulated and abused his secret security clearance issued by the U.S. Government to engage in lawlessness against a law abiding Citizen. However, the opposing legal counsel's Dystopian novel fell apart since J. Crockett destroyed Orange County Government's slanderous campaign of fear mongering propaganda in a Counter Motion to Orange County's Emergency Motion filed for a virtual hearing in reference to Florida Division of Administrative Hearings case #22-3897. With this in mind, Joshua Crockett was no longer employed, so why did Orange County Government illegally release a photograph without Joshua Crockett's permission and claim he ("Mr. Crockett") was a threat to personal and public safety without any evidence whatsoever?

82. Moreover, J. Crockett questioned Isiah White Jr. (black) in the previous hearing ("Case #22-3897"), and asked, "*just to confirm, any sort of instructions that come through from the top, from Demings (black) or whatever the case maybe is up to your discretion as the division manager to enforce those policies, correct*?" As such, Isiah White Jr. (black) testified, "*no, I don't have discretion with something that comes from the County, Joshua. It's called following the rules, so if they tell me I need to do* **whatever**. *It's my job to uh follow the rules and and do so uh with with whatever request they, they have in writing to me. It's called following written and verbal instructions.*"

83. Of course, J. Crockett asked, "*does this also apply if you*

*receive an **unlawful order?***" Shockingly, Isiah White Jr. (black) stated, "***um so, actually it does apply, Joshua**. You know when sometimes in life you, you gonna get orders that you gonna receive that's maybe that you don't agree with, but **I've learned to try to follow through with the order that I was given and then express my concern after the fact, but you don't push back beforehand**. You try to accomplish the order and then um then go through the proper process and and and into uh disputing the order that you received, but you don't not follow the instructions that you were given*." Again, Isiah White Jr. inadvertently telling the truth under oath is quite shocking, but hey, he's one of the good guys with a secret security clearance, right?

84. Importantly, J. Crockett questioned the Sr. Human Resources Advisor Monica Woods (black), by asking, "*so, based on your knowledge of Mr. Crockett's religious objections to COVID-19 vaccination and testing. Did you advise in your capacity as a Human Resources Sr. Advisor what Mr. White (black) should or should not do in relation to Title VII?*" As such, Monica Woods (black) said, "***um Title VII was not taken into consideration**.*" More importantly, Sr. Human Resources Advisor Monica Woods (black) continued to say, "*this had to do with our policies and practices that were in place for um Orange County unless Title VII was applicable which it was not in this particular case because accommodations were presented as well as um parameters provided to you with regard to guidance on how to um best proceed given the request that was submitted.*" As such, between Human Resources Senior Advisor Monica Woods (black) blatant admission of knowingly and willfully violating Title VII of the Civil Rights Act of 1964 for J. Crockett's sincerely held religious accommodation.

Of course, when added with Isiah White Jr's admission that sometimes in life you do have to follow unlawful orders it becomes explicitly clear that Orange County Government officials aren't remotely concerned with adhering to federal law as they publicly admitted before an ALJ in a separate hearing that their lawlessness is the key to successful government operations.

85. Finally, it should as no surprise that J. Crockett was targeted given his type of hair on November 30, 2021 exactly six days after the latest bogus COVID-19 charges with Charles Young (black) escalating a non-issue for the first time on the job, despite J. Crockett's type of hair being accepted previously for 2,156 days on the job.

86. In fact, the favoritism is out of control, as the tentacles of all these Masonic fraternities within Orange County Government need to be held accountable for violations of law. To put this into perspective, J. Crockett will share an example of this fraternity favoritism within Orange County Government. In essence, the Office of Professional Standards launched an investigation in 2019 involving the misconduct of Eastern Star Deldra McCutchen (black), the founder of Epsilon Sigma Tau. Unfortunately, Deldra McCutchen (black) was an opportunist and abused her position of authority within Orange County Government for economic gain under the guise of charity work through Epsilon Sigma Tau at the taxpayers' expense. Of course, a former Electronic Security Assistant, Margaret Sadberry (black) let the cat out the bag. In doing so, Ms. Sadberry (black) told OPS Investigator Clark Martens that Deldra McCutchen (black) was not working the hours she was being paid for as reflected in the Kronos timekeeping system. As such, Deldra McCutchen (black) had her hours manually changed by Security Administration employees according to

Margaret Sadberry (black).

87. In fact, Deldra McCutchen (black) was accused of arriving and leaving Orange County premises whenever she wanted and not properly clocking in and out. Apparently, Deldra McCutchen (black) also had an Annual Dock Parking Permit with no expiration date and parked in the dock basin area each day when on on-site. Of course, this is true, as J. Crockett observed this special employment privilege that Deldra McCutchen (black) was privy to. In conclusion, Margaret Sadberry (black) told Clark Martens that this practice had been ongoing for a number of years and the issuance and management of the annual dock passes was exclusively handled by the Administrative Assistant Linda Hall (black). In fact, Margaret Sadberry (black) observed Deldra McCutchen (black) park her vehicle in the dock basin and go to her office, without clocking-in. Furthermore, Margaret Sadberry (black) felt Linda Hall (black) was running security and could do whatever she wanted. In essence, Margaret Sadberry (black) believed Linda Hall (black) told Security Supervisor Sandra Dailey (black) to hire Deldra McCutchen (black) for the Electronic Security Specialist due to their friendship.

88. As such, Margaret Sadberry (black) believed Linda Hall (black) told Security Supervisor Sandra Dailey (black) to hire Deldra McCutchen (black) for the Electronic Security Specialist due to their friendship. Of course, Margaret Sadberry (black) confirmed Deldra McCutchen (black) was not qualified for the position of Electronic Security Specialist and was not familiar with the systems she was required to access in the performance of her duties. Nevertheless, J. Crockett agrees with this assessment, as he ("Mr. Crockett") was qualified and overlooked for this promotional opportunity due to not being a member of

Epsilon Sigma Tau and not being the right color, race, national origin or sex; thus, establishing Black Privilege.

89. Ultimately, J. Crockett was ineligible to be interviewed, much less offered equal opportunity due to the blatant quid pro quo within the Security Division and pervasive Black Privilege. Nevertheless, Margaret Sadberry (black) even disclosed that Security Supervisor Sandra Dailey (black) knew that Deldra McCutchen (black) was not using the Kronos time clock to properly submit her time because Sandra Dailey (black) had to approve the payroll each pay period. As such, Margaret Sadberry (black) suspected that the improper recording of the Deldra McCutchen (black) work hours had been occurring for a number of years due to the quid pro quo benefits between Administrative Assistant Linda Hall (black) and Electronic Security Specialist Deldra McCutchen (black). Nevertheless, Clark Martens interviewed Security Event Liaison Dwayne Butler (black) who confirmed he had been Deldra McCutchen's supervisor from 2012-2017 and had known her for over 15 years. In fact, Dwayne Butler (black) acknowledged Deldra McCutchen (black) had some performance issues to include not clocking in and out properly, tardiness and leaving work early. Moreover, Dwayne Butler (black) in his prior role as an Assistant Security Supervisor even admitted, that on occasion, he performed edits for Deldra McCutchen's work hours, but was quick to point out that Security Supervisor Sandra Dailey (black) approved the edits for the pay period. Of course, in the OPS investigate report, there's a discrepancy, Dwayne Butler (black) only acknowledges the clock-in and clock-out issues with Deldra McCutchen (black) only went as far back as 2017.

90. However, Deldra McCutchen admitted she had been

submitting her work hours to Administrative Assistant Linda Hall (black) since Deldra McCutchen (black) was hired in the Security Division. Again, in this investigate report, Deldra McCutchen (black) admitted she knew Linda Hall (black) as a co-worker for 19 years. In fact, Deldra McCutchen (black) admitted she associated with Linda Hall (black) outside of work occasionally since they belonged to the same fraternity. Of course, Security Supervisor Sandra Dailey (black) claimed she was not friends with Deldra McCutchen (black) and merely knew her as a co-worker for 7 years. Unfortunately, this raises a pivotal question, why did Sandra Dailey (black) sign off on the approval of the pay periods for June through July 2019 with **45** Kronos Payroll entries for Deldra McCutchen (black)?

91.  Ultimately, Clark Martens determined that Deldra McCutchen (black) violated Orange County Policy 401 - Productive Work Environment and Standards of Behavior and Orange County Policy 413.2 - under "Types of Offenses" which included Fraud or Dishonesty, Violation of the County's Code of Conduct, Misconduct and Excessive or habitual absenteeism, unauthorized absences or tardiness. As such, Linda Hall (black) was charged with the same violations of policies, except for Excessive or habitual absenteeism, unauthorized absences or tardiness. Ultimately, Deldra McCutchen (black) was terminated, but she wasn't slandered unlike J. Crockett nor did J. Crockett engage in lawlessness. Interestingly enough, Administrative Assistant Linda Hall (black) was not terminated, despite serious violations of policies; however, J. Crockett is terminated for simply being a Chippewa Indian who also celebrated being a European with his with his texture of hair given his different hairstyles. As such, a clear pattern of Black Privilege emerges from the depths of the Convention Center. To make matters worse, black females with a different texture of hair

- 52 -

*in violation of the same EG2 Grooming policy weren't terminated or even disciplined for it either.*

92. Of note, J. Crockett is skipping an excessive amount of evidence that hasn't been included in this Amended Complaint. First, it's important to understand J. Crockett has applied for 27 job positions within Orange County from November 28, 2021 to April 27, 2023. However, since J. Crockett is pursuing this federal case in toto, a more detailed analysis is required; thus, when J. Crockett's job applications submitted from June 22, 2017 are included, the grand total rises to 52 job applications within Orange County Government. Ultimately, how does the Defendant justify J. Crockett not being offered any advancement opportunities despite 52 such attempts to do so? Moreover, J. Crockett was unlawfully terminated 419 days after filing a complaint with the Florida Commission on Human Relations, which just so happens to be the 81st prime number, if that isn't retaliation and a ritual, then what is?

93. Nevertheless, after J. Crockett was unlawfully terminated on June 19, 2023 his former job of Security Representative was posted on LinkedIn on June 23, 2023 merely 4 days later with a closing date of July 7, 2023. Unfortunately, July 7, 2023 was also the date that illegal photograph was published of J. Crockett in a plague doctor mask which was utterly unprecedented and done so without J. Crockett's approval, but it was done so to label him ("Mr. Crockett") as a domestic terrorist. Again, Isiah White Jr. (black) used his nearly three decades of law enforcement experience and a security clearance as justification to knowingly and willfully falsely claim J. Crockett was a threat to personal and public safety in a signed affidavit in that emergency motion filed by the Defendant's legal counsel in Florida's DOAH case #22-3897.

## 2. <u>Summary of Relief Requested</u>

In essence, J. Crockett requests for the following types of relief: which includes $9,300,000 in punitive, compensatory, front pay, back pay and/or all other forms of equitable relief. In fact, J. Crockett is requesting for the midpoint of the salary of the Director pay rate of $131,929.09; thus, this can be multiplied by the number of years to achieve retirement age. As of this writing, J. Crockett is 31 years of age; thus, 34 years to achieve a retirement at 65 years of age at that annual rate of pay is: $4,485,589.23 in front pay. As a reminder, there is no statutory cap for front pay; however, if J. Crockett is limited to just Title VII of the Civil Rights Act of 1964, including the Americans for Disabilities Act of 1990 as amended then the total damages the undersigned respectfully requests is $4,785,589.23 in damages. However, if this is the case, then J. Crockett will not waive his legal rights to pursue the other $4,500,000 in damages for the illegal release of J. Crockett's photograph with his image and likeness against Orange County Government. In conclusion, if the Defendant agrees to the settlement terms and conditions, J. Crockett will provide a substantial discount for his legal services; thus, it would be reduced to a pro se legal fee of only $14,410.77. In closing, Orange County Government would only pay $9,285,589.23 for all other claims, not including the substantially reduced legal fee with a final total at $9,300,000 with all tax liability assumed by Orange County Government.

### B. <u>Parties</u>

### 3. <u>Plaintiff</u>

The undersigned ("Joshua Crockett or J. Crockett") is a pro se litigant who lives and resides in the State of Arizona and operates out of 3900 N. Stockton Hill Rd Suite B 101, Kingman, Arizona 86409.

### 4. **Defendant**

As such, Orange County Government is a political subdivision of the State of Florida located at 201 S. Rosalind Ave, Orlando Florida 32801. Also, recognized as a public agency according to 29 USC § 203(x).  Nevertheless, the public officials named herein that are employed by the political subdivision of the State of Florida are also relevant to this case in their official capacity as public servants. In conclusion, this includes Security Manager Isiah White Jr. (black); Security Supervisor Sandra Dailey (black); former Security Supervisor Daniel Brady (white); Security Administrator Sylvester Earl Biggett (black); Assistant Security Supervisor Charles Arthur Young (black); Sr. Human Resources Advisor Monica Woods (black); Assistant Human Resources Director Reginald Davis (black); Assistant Orange County Attorney Shonda White (black) and Mayor Jerry Demings (black).

### C. **Jurisdiction & Venue**

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, and 1343. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§2000e-5(f)(1) and (3) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 §1981a. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court of the Middle District of Florida.

### Count 1: **Title VII of the Civil Rights Act of 1964**

Of note, Joshua Crockett ("Plaintiff") repeats all of the allegations in all of the paragraphs ("1-93") above as though fully set forth herein in support of this Count due to an unlawful termination, failure to hire, and direct discrimination.

## Count 2: <u>Americans for Disabilities Act of 1990</u>

Again, J. Crockett repeats all of the allegations in all of the paragraphs ("1-93") above as though fully set forth herein in support of this Count due to an unlawful termination, failure to hire, and direct discrimination.

## Count 3: <u>42 U.S.C. § 1981</u>

Moreover, J. Crockett repeats all of the allegations in all of the paragraphs ("1-93") above as though fully set forth herein in support of this Count due to an unlawful termination, failure to hire; thus, establishing a "but-for-cause" of color, race and national origin discrimination.

## <u>Prayer for Relief</u>

**WHEREFORE**, J. Crockett ("the Plaintiff") requests the Court: for $9,300,000 in total damages, including legal fees and/or any and all other forms of such equitable relief that may be granted in the interest of justice.

## <u>Proof of Service</u>

I **HEREBY CERTIFY** that on August 4, 2024, the foregoing was filed through the Web Portal and a copy was furnished electronically to the Defendant's legal counsel Patricia ("Patti") Rego Chapman with Dean, Ringers, Morgan & Lawton, P.A. at PChapman@DRML-Law.com located at Post Office Box 2928 in Orlando, Florida 32802-2928 on behalf of the Orange County Board of County Commissioners. In closing, J. Crockett does not waive his right to introduce new evidence that is related to this case that wasn't covered.

_Joshua Crockett_

Plaintiff Joshua Crockett ("Pro Se")

3900 N Stockton Hill Rd Suite B 101 Kingman, Arizona 86409

officialcrockett@yahoo.com